**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Colleen M. O'Toole, et al.,

        Plaintiffs,

    v.

Maureen O'Connor, et al.,

        Defendants.

Case No. 2:15-cv-1446

Judge Graham

Magistrate Judge Deavers

## Opinion & Order

Defendants move for judgment on the pleadings. (Doc. 27). Defendants present a variety of reasons why the Court should dismiss all of Plaintiffs' claims with prejudice. The Court agrees with Defendants on all but one of Plaintiffs' claims.

### I.  Background

Plaintiffs challenge provisions of the Ohio Code of Judicial Conduct, specifically, provisions regulating judicial elections. Three plaintiffs bring claims. One: Colleen M. O'Toole, who currently presides as a judge on Ohio's Eleventh District Court of Appeals. O'Toole is a candidate for election to the Ohio Supreme Court. Two: Friends to Elect Colleen M. O'Toole ("the Committee"), a campaign committee that registered with the Ohio Secretary of State to receive contributions and make expenditures on behalf of O'Toole in her campaigns for judicial office. Three: Gary Broska, a would-be contributor to O'Toole's campaign fund.

Plaintiffs sue three defendants: (1) Maureen O'Connor, Chief Justice of the Ohio Supreme Court; (2) Scott J. Drexel, disciplinary counsel of the Ohio Supreme Court; and (3) Richard A. Dove, Secretary to the Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court. (Am. Compl. at ¶¶ 10–12). Plaintiffs allege Defendants adopted, promulgated, and have enforced or threaten to enforce certain unconstitutional provisions of the Ohio Code of Judicial Conduct. (Am. Compl. at ¶ 14).

"The Ohio Code of Judicial Conduct establishes standards for the ethical conduct of judges and judicial candidates." Ohio Code of Jud. Cond., Preamble [3] (2009, as amended August 11, 2015).[1] Its aspirational goals are "to provide guidance and assist judges in maintaining the highest standards of judicial and personal conduct and to provide a basis for regulating their conduct through disciplinary agencies." *Id.* The Code consists of four canons, which are general statements expounded upon in more detail by the individual rules. Canon Four, the canon that contains the challenged rules, states "A judge or *judicial candidate* shall not engage in political or campaign activity that is inconsistent with the *independence*, *integrity*, or *impartiality* of the judiciary." *Id.* at 74.[2]

Plaintiffs challenge several rules in Canon 4: Rules 4.3(C), 4.3(D), 4.4(A), and 4.4(E). Rules 4.3(C) and (D) regulate the use of the word "judge" and other official titles in campaign communications. Rule 4.4(A) forbids judicial candidates from personally soliciting contributions. Rule 4.4(A) also allows judicial candidates to establish a campaign committee that may solicit contributions but requires the candidate to ensure that the committee complies with all applicable law, including relevant parts of the Code itself. Rule 4.4(E) limits the Committee from either soliciting or receiving contributions outside of a 16-month window leading up to and after the general election.

The Court has already analyzed one of these rules. The Court analyzed Rule 4.4(E) when it denied Plaintiffs' motion for preliminary injunction, holding that Plaintiffs were unlikely to succeed on the merits of their claim because Rule 4.4(E)'s temporal limit on solicitation satisfied strict scrutiny and the temporal limit on receiving contributions satisfied intermediate scrutiny. (Doc. 15, June 3, 2015). The Sixth Circuit affirmed that order in a published opinion under even stricter reasoning, holding that the temporal limits on both the solicitation and receipt of contributions satisfied strict scrutiny. *See O'Toole v. O'Connor*, 802 F.3d 783, 789 (6th Cir. 2015). The Sixth Circuit held that the government's interest was compelling, as it had been since the time of "the Magna Carta." *Id.* The court also held that the limits were narrowly tailored to advance the government's interest.

---

[1] The Court cites to the most recent version of the Code only for those sections not at issue in this case and not provided by the parties.
[2] Terms defined in the Ohio Code of Judicial Conduct are italicized.

Now, Defendants move for judgment on the pleadings, citing what would be a purpose-less discovery process and the Sixth Circuit's order, arguing that the Court can dismiss Plaintiffs' claims because the Court can decide the contested issues as a matter of law.

In a similar case, other plaintiffs challenge some of these same rules. *See Platt v. Bd. of Comm'rs on Grievances and Discipline of the Ohio Supreme Court*, 1:13-cv-435 (S.D. Ohio) (Barrett, J.). Plaintiffs in this case also want the Court to consider evidence from the *Platt* case, specifically, answers to interrogatories. Defendants in this case want the Court to consider the protective order issued by Judge Barrett in *Platt*—it supports their argument that the Court needs no discovery to decide the case.

## II.  Standard of Review

"After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Motions under Rule 12(c) are analyzed under the same standard as a motion to dismiss authorized by Rule 12(b)(6): The Court construes the complaint in the light most favorable to plaintiff, and the Court accepts as true all of the factual allegations contained in the complaint. *See Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295–96 (6th Cir. 2008); *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 409 (6th Cir. 2016). The Court need not accept as true any "legal conclusions or unwarranted factual inferences." *U.S. ex rel. Sheldon*, 816 F.3d at 409 (quoting *Debevec v. Gen. Elec. Co.*, 121 F.3d 707, 1997 WL 461486, at *2 (6th Cir. 1997) (unpublished table decision)). "A motion brought pursuant to Rule 12(c) is appropriately granted 'when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007)). Defendants state without further argument that the standard of review is the same as for a Rule 12(b)(6) motion.

Plaintiffs do not dispute this standard, but argue throughout their response that the Court should not decide the case on only the pleadings. Plaintiffs argue that Defendants' reliance on self-serving *ipse dixit* (Latin for "he himself said it"), *Black's Law Dictionary* 956 (10th ed. 2014), is misplaced and argue that granting Defendants' motion would be "at best, premature and, substantively, without merit." (Pls.' Resp. at 1, Doc. 32). It would be premature, they argue,

because "[w]hen the Government restricts speech, the Government bears the burden of *proving* the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) (emphasis added); *see also Lavin v. Husted*, 689 F.3d 543, 547 (6th Cir. 2012) ("What *Buckley* requires is a demonstration, not a recitation."). Plaintiffs, zeroing in on the word "prove," argue that Defendants cannot possibly prevail on a 12(c) motion because they must, as a matter of First Amendment law, prove or demonstrate that the rules are constitutional; they cannot simply rest on the pleadings.

Plaintiffs' theory amounts to a categorical rule that courts could not consider Rule 12(c) motions (or Rule 12(b)(6) motions) in First Amendment cases. Plaintiffs provide no authority that would allow the Court to announce such a categorical rule. The authority Plaintiffs do provide are analyses on motions for summary judgment, *see, e.g., Lavin*, 689 F.3d at 546, so it is unsurprising that those courts employ the language of "proof" and "demonstration" and reject pleadings-style recitals, *see id.* at 547 (requiring proof of government's interest); *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007) ("[T]he government must come forward with some quantum of evidence, beyond its own belief in the necessity for regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals."). And while Plaintiffs' position finds support in a key Supreme Court decision, that support comes from a dissenting opinion. *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1678–79 (2015) (Scalia, J., dissenting) (noting the Court's failure to identify any evidence of narrow tailoring, relying instead on its own intuition).

To the contrary, courts may rule on the issues of the state's interest and narrow tailoring without the benefit of discovery. *See, e.g.*, *Sensations, Inc.*, 526 F.3d at 303 (affirming grant of government's Rule 12(c) motion on First Amendment issues). But is there a bright-line rule? At least one court in the Sixth Circuit has held that constitutionality is a question of law, but "a jury may make factual determinations as to compelling interests and narrow tailoring." *Thomas v. Schroer*, No. 2:13-CV-02987, 2016 WL 1261176, at *5 n.2 (W.D. Tenn. Mar. 30, 2016) (citing *Majeske v. City of Chicago*, 218 F.3d 816 (7th Cir. 2000) (ruling on appeal from trial in which jury made factual findings on question of compelling interest and question of narrow tailoring)); *Henry v. City of Cincinnati, Ohio*, No. C-1-03-509, 2005 WL 1198814, at *9 (S.D. Ohio Apr. 28, 2005) ("[W]ithout affording the parties an opportunity to present evidence, the Court cannot

4

properly determine" whether regulations are narrowly tailored); *but see United States v. Friday*, 525 F.3d 938, 949 (10th Cir. 2008) ("In First Amendment cases, application of the least-restrictive-means (or 'narrow tailoring') test to a given set of facts is well understood to be a question of law."); *United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992) (holding narrowly tailored question is "of course a question of law.").

A state's compelling interest or a regulation's tailoring could be the subject of factual discovery, but in the context presented here, the Court finds ample support in the law to decide whether Ohio has a compelling interest and whether it has narrowly tailored the rules to forward that interest. Since other courts have found an identical interest compelling and similar regulations have been held to be narrowly tailored, the Court does not need new facts, and the Court can decide the issue of narrow tailoring as a matter of law. *See Sensations, Inc.*, 526 F.3d at 299 (analyzing whether ordinance was narrowly tailored by comparing similar cases). While Plaintiffs lay the accusations of *ipse dixit* on thick, they point to few specific facts that would be the subject of discovery. Some of what Plaintiffs suggest for inclusion in the evidentiary record sounds more like the work of the Court answering questions of law. (*See* Pls.' Resp. at 23 n. 10 ("[U]ntil an evidentiary record can be developed that specifically addresses how Rule 4.3(D) has been construed, interpreted and applied, it would be premature to make a definitive determination thereon at the pleadings stage.")). The rest of Plaintiffs' suggested discovery is ambiguous or unnecessary.

## III. Discussion

Because "[s]peech is an essential mechanism of democracy . . . . The First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (internal quotation mark and citation omitted) (quoting *Eu v. S.F. Cnty. Democratic Central Comm.*, 489 U.S. 214, 223 (1989)). Therefore, "[l]aws that burden political speech are 'subject to strict scrutiny.'" *Id.* at 340 (quoting *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.)). But since "[j]udges are not politicians, even when they come to the bench by way of the ballot. . . . A State may assure its people that judges will apply the law without fear or favor—and without having personally asked anyone for money." *Williams-Yulee*, 135 S. Ct. at 1662. The Court strictly scrutinizes the judicial-election rules here, but the govern-

ment's compelling interest in the appearance and reality of a competent, fair, and unbiased judiciary allows the government wider latitude to regulate speech in judicial elections.

Strict scrutiny requires the Court to invalidate a rule if it is not narrowly tailored to promote a compelling government interest. The government's interest is the same for all these rules, and the government's interest is compelling. "The concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record. But no one denies that it is genuine and compelling." *Williams-Yulee*, 135 S. Ct. at 1667. Ohio's interest is the same as Florida's was in *Williams-Yulee*, and the Sixth Circuit found that Ohio's interest in "judicial impartiality, judicial independence [and] judicial integrity" was "well-established, was previously recognized by this Circuit with respect to Rule 4.4(E), and was recently reiterated by the Supreme Court." *O'Toole v. O'Connor*, 802 F.3d at 789–90 (citing *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 454 (6th Cir. 2014); *Williams-Yulee*, 135 S. Ct. at 1666). The Code of Judicial Conduct recites in greater detail the government's interest:

> An independent, fair, and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, the judiciary plays a central role in preserving the principles of justice and the rule of law. Inherent in all the rules contained in this code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.

Ohio Code of Jud. Cond., Preamble [1].

The Court holds that for all the rules Plaintiffs challenge, there exist compelling state interests. The only question, then, is whether those rules are narrowly tailored to achieve those interests.

### A. Rule 4.4(E) – Restriction on when a judicial campaign committee may commence soliciting or receiving campaign contributions

All three Plaintiffs challenge Rule 4.4(E). Rule 4.4(E) states, in relevant part:

The campaign committee of a *judicial candidate* may begin soliciting and receiving *contributions* no earlier than one hundred twenty days before the first Tuesday

after the first Monday in May of the year in which the general election is held. If the general election is held in 2012 or any fourth year thereafter, the campaign committee of a *judicial candidate* may begin soliciting and receiving *contributions* no earlier than one hundred twenty days before the first Tuesday after the first Monday in March of the year in which the general election is held.

Ohio Jud. Cond. Rule 4.4(E) (2009, as amended November 18, 2014).

There are two sets of issues to address under Plaintiffs' challenges to Rule 4.4(E). First: the Committee's challenge, which this Court and the Sixth Circuit analyzed when ruling on Plaintiffs' motion for preliminary injunction. Second: a newly added Plaintiff, Gary Broska, alleges he wanted to contribute to O'Toole's campaign, but Rule 4.4(E)'s fundraising limitation prevented him. (Am. Compl. at ¶¶ 8, 49–54).

## 1. The Committee's Claims

The Committee argues that Rule 4.4(E) violates the First and Fourteenth Amendments, citing three reasons the Court should deny Defendants' Motion: (1) regulation of the Committee cannot be justified under an alter ego theory, (Pls.' Resp. at 35), (2) deciding certain issues requires a factual record, so judgment on the pleadings is improper, (*id.* at 39), and (3) Rule 4.4(E) has a disparate impact on fundamental rights and therefore the Rule violates the Equal Protection Clause, (*id.* at 41). Defendants respond, arguing that the Sixth Circuit rejected these arguments. The Sixth Circuit addressed the Committee's First Amendment and Fourteenth Amendment claims in detail, and for the same reasoning it expressed, these claims are dismissed.

### a. First Amendment Claim

Analyzing the likelihood of success on First Amendment grounds, the Sixth Circuit held that "Plaintiff fails to demonstrate a likelihood of success on the merits even when strict scrutiny is applied to the regulation as a whole, encompassing both solicitation and receipt of campaign contributions." *O'Toole v. O'Connor*, 802 F.3d at 789. "In order to satisfy strict scrutiny, a regulation must be 'narrowly tailored to serve a compelling interest.'" *Id.* (quoting *Williams–Yulee*, 135 S. Ct. at 1664).

Judicial election regulations must be narrowly tailored, not perfectly tailored. *O'Toole*, 802 F.3d at 790; *Williams-Yulee*, 135 S. Ct. at 1671. "The impossibility of perfect tailoring is

especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary." *Williams-Yulee*, 135 S. Ct. at 1671.

> The *Williams–Yulee* Court found in that case that Florida's ban on all campaign contribution solicitation by judges restricted only "a narrow slice of speech." *Id.* at 1670. The regulation at issue in this case restricts an even narrower slice of speech, allowing a judicial campaign sixteen months in which to receive and solicit contributions. . . . Rule 4.4(E) is focused exclusively on the solicitation and receipt of money—the activities most likely to harm public confidence in the judiciary. . . . during the period of time that most implicates the government's stated interests, recognizing that contributions that are not proximate in time to an election can increase the appearance of impropriety and the risk of actual bias.

*O'Toole v. O'Connor*, 802 F.3d at 790.

While the Sixth Circuit's analysis was at the preliminary injunction stage, there is no denying its force now. For these same reasons, the Court continues to hold that Rule 4.4(E) is narrowly tailored to advance Ohio's compelling interest. Plaintiffs fail to meaningfully distinguish *Williams-Yulee*.

Plaintiffs argue that "[r]egulation of the Committee cannot be justified under an alter ego theory." (Pls.' Resp. at 35). Plaintiffs note the many situations where the Committee and the judicial candidate are treated (or referred to) in distinct ways rather than as alter egos of one another. Therefore, they argue, the same reasoning cannot support the regulation of both the Committee and the candidate because the two are distinct. Put another way, if the personal-solicitation ban on the candidate is narrowly tailored to promote Ohio's interest in the integrity of its judiciary, then the fundraising window limiting the Committee is at least *less* narrowly tailored.

While the fundraising window may be less narrowly tailored, it still passes muster. Plaintiffs provide no reason to depart from this Court's or the Sixth Circuit's reasoning:

> While the concerns raised by a judicial campaign committee's solicitation may be more attenuated than those raised by direct candidate solicitation, the close connection between judicial candidates and their campaign committees under Ohio law implicates many of the same concerns regarding judicial integrity and propriety. Judicial campaign committees in Ohio derive their authority from the candidate and, in fact, may include the candidate herself. *See* Ohio Rev. Code § 3517.01(C)(1) (defining "campaign committee" as "a candidate or a combination of two or more persons authorized by a candidate ... to receive contributions and

make expenditures"); Ohio Jud. Cond. R. 4.4(A) ("A judicial candidate may establish a campaign committee to manage and conduct a campaign for the candidate...."). Moreover, in addition to the actual or apparent authority judicial candidates wield over their campaign committees, Ohio law requires that "[t]he name of a campaign committee shall include at least the last name of the campaign committee's candidate," further aligning the committee with the candidate in the eyes of the public. Ohio Rev. Code § 3517.10(D)(1); *see also Platt*, 769 F.3d at 454 (recognizing Ohio's compelling state interests in enforcing Rule 4.4(E) in holding that an "as applied" challenge to the rule did not show a likelihood of success).

*O'Toole v. O'Connor*, 802 F.3d at 789–90.

Plaintiffs are correct that the alter ego doctrine may not apply precisely, but similar principles do. The Supreme Court has recognized that "personal solicitation by judicial candidates implicates a different problem than solicitation by campaign committees." *Williams-Yulee*, 135 S. Ct. at 1669. This is because "[t]he identity of the solicitor matters, as anyone who has encountered a Girl Scout selling cookies outside a grocery store can attest." *Id.* at 1669. But the Court sees no escaping the Sixth Circuit's reasoning on this issue. While the personal-solicitation prohibition may advance Ohio's interest in a narrowly tailored way, limiting the Committee's fundraising efforts to a 16-month period does so too. *See O'Toole v. O'Connor*, 802 F.3d at 790.

### b. Equal Protection Clause Claim

Defendants move to dismiss Plaintiffs' equal-protection claims, again pointing to the Sixth Circuit's holding in *O'Toole*. Plaintiffs oppose Defendants' motion on two grounds: (1) the Court needs the benefit of an evidentiary record to decide the case, and (2) Rule 4.4(E) violates the Equal Protection Clause because it has a disparate impact on fundamental rights in two ways: first, the rule favors incumbents who retained funds from a previous election, and second, it favors political action committees because it does not regulate them in the same way it regulates campaign committees.[3]

Plaintiffs argue that the Court needs to decide the equal protection issues with the benefit of an evidentiary record. Plaintiffs argue that the Court needs an evidentiary record to assess

---

[3] Plaintiffs argue for a subtle distinction between the analysis under the First Amendment and the Fourteenth Amendment but go on to argue that under either claim the Rule is subject to strict scrutiny. (Pls.' Resp. at 42–43). The Sixth Circuit already appeared to apply strict scrutiny to both claims. *O'Toole v. O'Conner*, 802 F.3d at 792.

whether the contribution limits "(i) prevent candidates from amassing the resources necessary for effective [campaign] advocacy; or (ii) magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." (Pls.' Resp. at 39 (alteration in original) (quoting *Randall v. Sorrell*, 548 U.S. 230, 248 (2006))). Defendants argue that these matters can be determined as a matter of law, and that the Sixth Circuit has rejected this argument already. Plaintiffs respond that *Randall* requires evidence to determine whether she was put at a "significant disadvantage," specifically, evidence about the "extensive campaign activities/expenditure [sic]," and "what is and is not necessary to run an effective statewide campaign in Ohio." (Pls.' Resp. at 39–40). Plaintiffs offer, as a harbinger of this evidence, two committee reports suggesting that any fundraising-window rule should be tied to another rule: incumbents' campaigns should not use surplus funds from a prior campaign. (*Id.* at 4–6 (citing Exs. A and B)).[4]

But facts are not necessary and the Sixth Circuit closed this avenue for review when it held that

> the rule is not the cause of the disparity that concerns Plaintiff. Plaintiff's candidate and her competitors are all sitting judges who have previously stood for election. Because the complained-of differential effect arises not from any lack of equality in the rule itself, but rather from how different candidates have acquired, used, and husbanded their resources in previous campaigns . . . .

*O'Toole v. O'Conner*, 802 F.3d at 791. And while *Randall* requires courts to exercise their own "independent judicial judgment as a statute reaches those outer limits," it recognized a general deference to the legislature, only requiring courts to "review the record" when "there is strong indication in a particular case . . . that such risks exist." *Randall*, 548 U.S. at 249. Plaintiffs' argument—that the rule violates their fundamental rights by favoring incumbents' campaign committees—fails, not least because O'Toole is a sitting judge, and the suggestions in the committee reports, which could qualify as the "danger signs" that *Randall* warns of, don't have the same force with an incumbent as they do with first-time candidates.

---

[4] The Ohio Supreme Court commissioned a report to "conduct a top-to-bottom review of Ohio's judicial election system in Spring, 1994." (*Id.* at 4). It selected a committee, chaired by Judge Richard B. McQuade, Jr., to perform research and recommend policy changes if needed. The committee distilled its work into a report in 1995: the McQuade Committee Report. The Ohio Supreme Court revisited similar topics again in 2007–08 with a Task Force on the Code of Judicial Conduct. (Doc. 32-2).

Finally, Plaintiffs argue that Rule 4.4(E) violates the Equal Protection Clause because it favors entities like political action committees that can take part in judicial campaigning but are not subject to the same fundraising restrictions as a judicial candidate's campaign committee. As the Court previously held, "this argument simply returns the plaintiffs to the essence of their First Amendment claim: that Rule 4.4(E) is not narrowly tailored to serve a compelling state interest, that the rationale for imposing a time restraint on fundraising solicitations by judicial campaign committees does not pass strict scrutiny review." (Op. and Order at 11, Doc. 15). The Sixth Circuit agreed, noting the "unique nature of judicial elections and the importance of maintaining the integrity and impartiality of the judiciary—interests that are different from those implicated by political campaigns." *O'Toole v. O'Connor*, 802 F.3d at 792. The Court cannot see how the analysis for this claim differs in substance from the First Amendment claims. This claim likewise fails.

### 2. Gary Broska's Claims

While this Court has already analyzed many of Plaintiffs' claims regarding Rule 4.4(E), Gary Broska's introduction into the lawsuit presents a new wrinkle: he claims that the rule's restriction on the Committee's receipt of contributions limits his rights to freedom of speech and association. (Am. Compl. at ¶¶ 49–54). Specifically, he alleges he wanted to donate to O'Toole's campaign but the campaign advised him that the rules prevented it from accepting donations, so he did not donate. (Am. Compl. at ¶¶ 50–53). Plaintiffs argue that this amounts to an "outright prohibition by which he could not make any contribution whatsoever." (Pls.' Resp. at 31).

Courts typically construe rules like Rule 4.4(E), as applied to contributors, as limits on associational freedoms because they do not "in any way infringe the contributor's freedom to discuss candidates and issues." *Randall*, 548 U.S. at 247 (quoting *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) ("A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support.")). Broska attempts to distinguish *Buckley*, arguing that case concerned a rule limiting how much a person could contribute, and this case concerns "a regulation that prohibits any campaign contribution whatsoever." (Pls.' Resp. at 32). This is a false description of Rule 4.4(E). The rule limits *when* a person can contribute, much like *Buckley*'s rule limited *how much* a person can contribute. Rule 4.4(E) is a limit, not a ban; therefore, *Buckley* applies. *See Gable v. Patton*, 142 F.3d 940, 950–51 (6th Cir.

1998) (applying *Buckley* and holding that a 28-day window during which candidates could not receive "external" contributions was constitutional). Applying *Buckley*, the Court checks to see if the contribution limits are too tight. If so, the limits could exacerbate the very problem they seek to solve:

> [C]ontribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability. Were we to ignore that fact, a statute that seeks to regulate campaign contributions could itself prove an obstacle to the very electoral fairness it seeks to promote.

*Randall*, 548 U.S. at 248–49. Broska aligns his concern with the Court's in *Randall*. And the concern is this:

> [B]ecause in *Buckley* and *Shrink*, the Supreme Court broadly defined an individual's right of association to include the ancillary right of the candidate to 'amas[s] the resources necessary for effective advocacy.'. . . [T]he Supreme Court would find an unconstitutional infringement of an individual's right of political association where 'the contribution limit was *so radical in effect as to render political association ineffective,* drive the sound of the candidate's voice below the level of notice, and render contributions pointless.

*Frank v. City of Akron*, 290 F.3d 813, 818 (6th Cir. 2002) (citations omitted) (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 396–97 (2000)). But Rule 4.4(E) is not a ban on Broska's contributions; it creates a window in which he may contribute. And since the rule survives strict scrutiny as-applied to the Committee, it survives intermediate scrutiny as-applied to Broska. Broska's claims are therefore dismissed.

### B.  Rules 4.3(C) and (D)

O'Toole and the Committee challenge Rules 4.3(C) and (D) on First Amendment grounds. The Court considers the two rules together because they are closely related and implicate the same abstention concern. The rules state:

> During the course of any campaign for nomination or election to judicial office, a *judicial candidate*, by means of campaign materials, including sample ballots, advertisements on radio or television or in a newspaper or periodical, electronic communications, a public speech, press release, or otherwise, shall not *knowingly* or with reckless disregard do any of the following:
>    . . . .

(C) Use the title of a public office or position immediately preceding or following the name of the *judicial candidate*[5], when the judicial candidate does not hold that office or position;

(D) Use the term "judge" when the *judicial candidate* is not a judge unless that term appears after or below the name of the *judicial candidate* and is accompanied by either or both of the following:

(1) The words "elect" or "vote," in *prominent lettering*, before the *judicial candidate*'s name;

(2) The word "for," in *prominent lettering*, between the name of the *judicial candidate* and the term "judge" . . . .

Ohio Jud. Cond. R. 4.3.

Defendants present three reasons why these claims should be dismissed: (1) the Court should abstain from deciding the matter because there is a collateral state-court proceeding; (2) Plaintiffs lack standing; and (3) the rules are constitutional.

### 1. *Colorado River* Abstention

Defendants argue that because a parallel case is proceeding in state court, abstention doctrine requires the Court to dismiss Plaintiffs' claims about Rules 4.3(C) and (D). But the state-court case appears closed, so the Court will not abstain.

Defendants ask the Court to apply the doctrine of *Colorado River* abstention, a catch-all category resting on "considerations of '(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)). *Colorado River* abstention may be appropriate when a parallel case is pending in state court. *Id.* at 817–18. But a parallel, state proceeding may not exist where "little, if any, action has been taken" for multiple years. *Crawley v. Hamilton Cty. Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984) (more than three and a half years between last substantial activity on state court docket).

---

[5] Defined terms are italicized in the Ohio Code of Judicial Conduct, and "judicial candidate" is a defined term while "judicial" is not. Where defined terms are not italicized, the Court presumes this to be no more than a minor typographical error and not in any way an intended departure from the normal usage of the term "judicial candidate."

Here, in the relevant state-court proceeding, nothing has happened in over fourteen months, and nothing substantive has happened in over two and half years. On February 6, 2015, the docket reflects a "Mass Transfer of Judge Location." (Defs.' Ex. 1 at 1, Doc. 27-1). While it seems the case must still be open if it can be transferred, the absence of a motion to transfer, the absence of any further detail, and the language of the docket entry itself all indicate this was not a case-specific transfer. This "mass transfer" tells the Court that the case still has a heartbeat in some administrative system, but it has an otherwise weak pulse. In the most recent case-specific activity, on February 3, 2014, the court applied a security deposit to the clerk's and court reporter's fees and refunded the balance. (*Id.*). The most recent substantive legal activity is buried deeper still, when the Tenth District Court of Appeals dismissed an interlocutory appeal, an action docketed on December 23, 2013. (*Id.*). This activity (or lack thereof) indicates the case is not active. Other indicia counsel against abstention: (1) the court's docket status is "CLOSED," (*Id.*), and (2) a compliance officer and attorney with the Franklin County Court of Common Pleas states that the case is closed and not presently an active case. (Pls.' Ex. D, Doc. 32-4).[6]

The principles of *Colorado River* abstention, like "(w)ise judicial administration, . . . conservation of judicial resources[,] and comprehensive disposition of litigation" do not weigh in favor of abstention. *Colorado River*, 424 U.S. at 817. Here, the state-court docket and other evidence indicate that the state court proceeding is dormant, if not dead. If the Court abstained, it is not clear that judicial resources would be conserved or that abstention would aid the comprehensive disposition of this litigation. Since "only the clearest of justifications will warrant dismissal" under *Colorado River* abstention, and Defendants present the Court with murky waters at best, the Court will not abstain. *Id.* at 819.

### 2. Standing

Defendants argue that O'Toole lacks standing to challenge Rule 4.3(D) because she fails to satisfy the injury-in-fact requirement of Article III standing. O'Toole suffers no injury, they argue, because the rule does not regulate O'Toole; it only applies to a judicial candidate who "is

---

[6] The Court may consider evidence outside the pleadings—here, the compliance officer's affidavit—to resolve the factual dispute over whether the state-court case is still pending. *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004) (attacking the factual basis for jurisdiction requires the trial court to "weigh the evidence").

not a judge," and O'Toole is a judge. Since, for purposes of Rule 4.3, the Committee is only regulated to the extent the rule applies to O'Toole, the two Plaintiffs' standing rises or falls together.

Plaintiffs respond that Defendants' argument is disingenuous, citing an instance where Defendants' construe Rule 4.3(D) to mean just the opposite: "If indeed the candidate is a sitting judge and desires to use the term 'judge,' the Rule simply requires" compliance with Rule 4.3(D). (Defs.' Mot. J. Pleadings at 23). Defendants do not respond to this argument or develop the no-standing argument in their Reply brief.

Plaintiffs allege that "Rule 4.3(D) . . . applies not only to the campaigns of judicial candidates who are not presently sitting as a judge, but also to the political campaigns of sitting judges seeking election to a court on which the judge does not currently serve." (Am. Compl. at ¶ 148). Plaintiffs, anticipating that the Court might read this allegation as a legal conclusion, preemptively counter that it "asserts a mixed question of law and fact, that in turn, is to be treated as a factual allegation and presumed to be true." (Pls.' Resp. at 24–25). Plaintiffs "allegation" is not just a legal conclusion; it is a legal conclusion that appears to contradict the plain language of Rule 4.3(D), which only forbids a judicial candidate from "us[ing] the term 'judge' when the *judicial candidate* is not a judge." Ohio Jud. Cond. R. 4.3(D).

Plaintiffs argue this construction violates the Equal Protection Clause because it regulates judges and non-judges differently. When confronted with two possible readings of a statute, it is never the Court's preference to construe a law to violate the Constitution. *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Plaintiffs present the Court with two bad options. One: a constitutionally viable option that ignores the plain language of the Rule. Two: a plain language reading of the rule that violates the Equal Protection Clause.

The Court opts for a third option: a constitutionally viable reading that comports with the plain language of the rule. The rule regulates judges differently from non-judges, for it prohibits candidates from "us[ing] the term 'judge' when the *judicial candidate* is not a judge" unless the term is accompanied by language that clarifies that the candidate is seeking to become a judge. Ohio Jud. Cond. R. 4.3(D). While the rule may regulate judges and non-judges differently, and it may implicate strict scrutiny because it "infringes on a class of people's fundamental rights," namely, non-judge judicial candidates' freedom of speech, *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006), it likely does not fail strict scrutiny. The government's interest is established, and the rule applies quite narrowly. It applies to judicial candidates who are not judges, in a special type of election, and only to those who knowingly or with reckless disregard violate the rule. *See* Ohio Jud. Cond. R. 4.3. In short, the Court cannot ignore the plain language of the rule, and it is unlikely that under this construction the rule violates the Constitution.

Plaintiffs lack standing to challenge Rule 4.3(D) based on the Court's construction because O'Toole is a judge. The rule appears narrowly tailored to advance the government's interest in having judicial candidates that are "scrupulously fair and accurate in all statements." Ohio Jud. Cond. R. 4.3, Comment [1]. Therefore, Rule 4.3(D) likely passes strict scrutiny, so the Court's construction does not implicate the constitutional problem Plaintiffs say it does. The Court dismisses Plaintiffs' claims regarding Rule 4.3(D) for lack of standing.

### 3. Rule 4.3(C) – Merits

"[A] *judicial candidate* . . . shall not *knowingly* or with reckless disregard do any of the following:
. . . .
 (C) Use the title of a public office or position immediately preceding or following the name of the *judicial* candidate, when the judicial candidate does not hold that office or position;
. . . .
[2]      A sitting judge, who is a judicial candidate for a judicial office other than the court on which he or she currently serves, violates Rule 4.3(C) if he or she uses the title "judge" without identifying the court on which the judge currently serves.

Ohio Jud. Cond. R. 4.3 & cmt. [2].

16

Having passed the initial questions of abstention and standing, the Court now analyzes the merits of Plaintiffs' claim regarding Rule 4.3(C). But to do so, the parties argue, the Court must decide what type of speech is at issue: does the rule prohibit false speech, prohibit true but misleading speech, or does it compel speech? Defendants argue that Rule 4.3(C) only prohibits false speech. Plaintiffs contend it compels speech or prohibits true but misleading speech.

Plaintiffs argue the difference matters because the government may not regulate certain types of speech in the political context: the government may not regulate true-but-misleading speech at all in the political context, *see Discovery Network, Inc. v. City of Cincinnati*, 946 F.2d 464, 469 (6th Cir. 1991) ("[T]he prior regulation of speech considered potentially false or misleading would be impermissible if applied to political speech . . . .") *aff'd*, 507 U.S. 410 (1993); generally "[t]he government may not . . . compel the endorsement of ideas that it approves," *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012); and only narrow rules prohibiting false speech pass muster, *see United States v. Alvarez*, 132 S. Ct. 2537, 2546–51 (2012). But all three types of speech are subject to similar forms of strict scrutiny because, all are content-based restrictions on speech. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) (applying strict scrutiny to compelled speech); *Alvarez*, 132 S. Ct. at 2548 (applying "exacting scrutiny" to false-speech regulation); *In re Judicial Campaign Complaint Against O'Toole*, 141 Ohio St. 3d 355, 2014-Ohio-4046, 24 N.E.3d 1114, ¶ 20 (referring to regulations that prohibited both false speech as well as true-but-misleading speech as a content-based regulations examined under strict scrutiny). Even though strict scrutiny may apply no matter what type of speech this is, the type of speech matters for purposes of whether the rule is narrowly tailored.

Rule 4.3(C) prohibits false speech, true-but-misleading speech, and speech that is not even misleading; it does not, however, compel speech.

The First Amendment protects "freedom of speech and the corollary right not to speak." *Wilkins v. Daniels*, 744 F.3d 409, 414 (6th Cir. 2014). Examples of unconstitutional compelled speech include: "a state statute requiring schoolchildren to recite the Pledge of Allegiance and to salute the American flag, as well as a state statute requiring residents to display the state's motto

on their license plates." *Id.* at 415 (citations omitted). In short, the government cannot "compel the endorsement of ideas that it approves." *Knox*, 132 S. Ct. at 2288.

Here, the compelled-speech doctrine does not apply. The Court will not shoehorn Plaintiffs' claims into the compelled-speech doctrine even though Plaintiffs allege these rules require them to state more than they would otherwise say. (Am. Compl at ¶ 128). Rule 4.3(C) does not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Rule does not compel a judicial candidate to speak, unless that judicial candidate is already speaking, and then, the rule only requires the candidate to be comprehensive and not lie (or mislead) by omission.

Rule 4.3(C) prohibits false speech because Rule 4.3(C) prohibits a judicial candidate from saying they are a judge when they are not. Transgressing this rule would be a "demonstrable falsehood[]" which is "not protected by the First Amendment in the same manner as truthful statements." *Brown v. Hartlage*, 456 U.S. 45, 60 (1982). But the Constitution "stands against the idea that we need Oceania's Ministry of Truth." *Alvarez*, 132 S. Ct. at 2547 (citing G. Orwell, Nineteen Eighty-Four (1949) (Centennial ed. 2003)). First Amendment jurisprudence admits that "erroneous statement is inevitable in free debate," *Brown*, 456 U.S. at 60 ((quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)), and "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity," *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963). This is why broad bans on false or misleading political speech rarely survive strict scrutiny. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016) (declaring as unconstitutional Ohio statutes criminalizing false statements by candidates during political campaigns); *Winter v. Wolnitzek*, 56 F. Supp. 3d 884, 898–99 (E.D. Ky. 2014) (applying strict scrutiny to a misleading-political-speech regulation to find a "strong likelihood" that rule was unconstitutional).

But false speech gets less First Amendment protection than true-but-misleading speech. While regulations of both types of speech are subject to strict scrutiny, rules that prohibit true but possibly misleading speech are less likely to be narrowly tailored to promote a state's interest.

*See In re O'Toole*, 141 Ohio St. 3d at 361, ¶ 21. The Ohio Supreme Court reached this conclusion about a former rule of judicial conduct prohibiting true-but-misleading speech because it did not advance the government's compelling interest in "a competent and impartial judiciary" in the same way that prohibiting false statements advanced that same interest. *Id.* at ¶ 43. The rule was not narrowly tailored because it did "not leave room for innocent misstatements or for honest, truthful statements made in good faith but that could deceive some listeners." *Id.* at ¶ 42. For "[i]f there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (opinion of Brandeis, J., concurring).

Here, Plaintiffs provide examples of campaign language they would use if not prohibited from doing so by the rules. (Am. Compl. at ¶¶ 127). Defendants do not dispute that all the following examples are prohibited by Rule 4.3(C). Defendants argue that all of Plaintiffs' examples are false statements thus proving that the Rule regulates false speech. Defendants are correct about some of Plaintiffs' examples:

Judge Colleen O'Toole
Ohio Supreme Court

O'Toole
Justice
Ohio Supreme Court

O'Toole
Ohio Supreme Court
Justice

Justice
O'Toole
Ohio Supreme Court

(Am. Compl. at ¶ 127).These four examples are false speech prohibited by Rule 4.3(C). They all convey the message that O'Toole is an incumbent on the Ohio Supreme Court. To the extent that Rule 4.3(C) prohibits false speech, the rule is narrowly tailored to promote Ohio's interest in the appearance and reality of an impartial and fair judiciary. These are not merely "erroneous statement[s] . . . inevitable in free debate"; these are intentional falsehoods prohibited in a special type of election.  *Brown*, 456 U.S. at 60–61 (quoting *New York Times Co.*, 376 U.S. at 271–72).

But other versions are not clearly false, and perhaps not even misleading, but they are prohibited by Rule 4.3(C):

Judge O'Toole
to the Ohio Supreme Court

Elect Judge O'Toole
to the Ohio Supreme Court

Judge O'Toole
for the Ohio Supreme Court

(Am. Compl. at ¶ 127).

Why are these statements even prohibited? Rule 4.3(C) only says that candidates may not "[u]se the title of a public office or position immediately preceding or following the name of the *judicial* candidate, when the judicial candidate does not hold that office or position." Ohio Jud. Cond. R. 4.3(C). O'Toole is a judge, so calling herself "Judge O'Toole" seems innocent and accurate. But the rule has a wrinkle. Comment two states: "A sitting judge, who is a judicial candidate for a judicial office other than the court on which he or she currently serves, violates Rule 4.3(C) if he or she uses the title 'judge' without identifying the court on which the judge currently serves." Ohio Jud. Cond. R. 4.3(C), cmt. [2]. Comment two interprets Rule 4.3(C) to require the addition of "Eleventh District Court of Appeals" to "Judge O'Toole." But what force should the Comments have?

The Ohio Supreme Court has held that the "official comments are not binding or enforceable. Rather, they are intended to 'provide guidance regarding the purpose, meaning, and proper application of the rules.'" *In re Disqualification of Serrott*, 134 Ohio St. 3d 1245, 2012-Ohio-6340, 984 N.E.2d 14, ¶ 14 (quoting Ohio Code of Jud. Cond., Scope at ¶ 3). Furthermore, "the comments cannot prevail over the rule itself." *Id.* (citing *In re Disqualification of Celebrezze*, 127 Ohio St. 3d 1217, 2009-Ohio-7207, 937 N.E.2d 1009, ¶ 12). Even so, the comments do serve an important function:

[3] The Comments that accompany the rules serve two functions. First, they provide guidance regarding the purpose, meaning, and proper application of the rules. They contain explanatory material and, in some instances, provide examples of permitted or prohibited conduct. Comments neither add to nor subtract from the

20

binding obligations set forth in the rules. Therefore, when a comment contains the term "must," it does not mean that the comment itself is binding or enforceable; it signifies that the rule in question, properly understood, is obligatory as to the conduct at issue.

Ohio Code of Jud. Cond., Scope [3].

While comment 2 does not use the term "must," it requires certain conduct by expressly delineating conduct that violates Rule 4.3(C). To this extent, the comment, therefore, "signifies that the rule in question, properly understood, is obligatory as to the conduct at issue." *Id.* Therefore, the Court understands Rule 4.3(C) to forbid a judicial candidate from calling themselves a "judge" unless (1) the candidate gives the full, official title of the office, or (2) the candidate is an incumbent on the Court to which they seek election.

Defendants argue that "the text of Rule 4.3(C) comports with the Constitution—even if the comment does not." (Defs.' Mot. at 31). But, the comments provide examples of prohibited conduct, and those examples are to be understood not as additional rules or conflicting interpretations, but how the rule itself is to be properly understood. The comment and rule are not in conflict; properly understood, Rule 4.3(C) prohibits this speech by a judicial candidate: "Elect Judge O'Toole to the Ohio Supreme Court," which is neither false nor clearly misleading.

But Defendants read these differently, as two truths that, in context, amount to a lie. O'Toole is a judge; O'Toole seeks election to the Ohio Supreme Court; the lie: O'Toole is a sitting judge on the Ohio Supreme Court. Plaintiffs do offer three examples, (*see* Am. Compl. at ¶ 127), that could describe an incumbent seeking reelection to the Ohio Supreme Court, except to insiders who know that in Ohio, jurists on the state's highest court are called "Justices," not judges. Ohio voters could be misled to believe that O'Toole was a sitting jurist on the court to which she seeks election, especially if it was to a lower court where the elected jurists are called "Judges." Read this way, the rule appears to prohibit true-but-misleading speech. Defendants take this a step further, arguing that this is outright false speech. The Court disagrees.

Could a voter assume that Judge O'Toole was a Supreme Court Justice? Yes. Defendants argue that "Judge O'Toole to the Ohio Supreme Court," is a perfect example of false speech; the Court disagrees. Defendants argue that using "Judge" as a noun will lead readers to "inevitably assume that the word 'Judge' is the title of the current office holder who is seeking election—as

Judge on the Ohio Supreme Court." (Defs.' Mot. at 28). But the example above does not inexorably lead to that conclusion. Rule 4.3(C), properly understood, forbids speech that is not false and not even obviously misleading, and prohibiting this type of speech does not advance the government's interest in a fair and impartial judiciary. Rule 4.3(C) thus restricts more speech than is necessary to achieve the government's aims.

Rule 4.3(C) as interpreted by Comment two fails strict scrutiny because it suppresses true speech, and the government's interest in maintaining high ethical standards for its judges is not advanced by suppressing true speech in election campaigning. Therefore, Defendants' motion for judgment on the pleadings is denied as to Plaintiffs' claim regarding Rule 4.3(C). The Court declines to enter judgment for O'Toole *sua sponte*, however, and invites a motion from Plaintiffs.

### C.  Rule 4.4(A) – Personal Solicitation

O'Toole and the Committee challenge Rule 4.4(A). (Am. Compl. at ¶¶ 180–81). The Rule states:

> A *judicial candidate* shall not personally solicit campaign *contributions*, except as expressly authorized in this division, and shall not personally receive campaign contributions. . . . A *judicial candidate* may solicit campaign contributions in the following manner:
>
> (1) A *judicial candidate* may make a general request for campaign *contributions* when speaking to an audience of twenty or more individuals;
>
> (2) A *judicial candidate* may sign letters soliciting campaign *contributions* if the letters are for distribution by the *judicial candidate*'s campaign committee and the letters direct *contributions* to be sent to the campaign committee and not to the *judicial candidate*;
>
> (3) A *judicial candidate* may make a general request for campaign *contributions* via an electronic communication that is in text format if *contributions* are directed to be sent to the campaign committee and not to the *judicial candidate*.

Ohio Jud. Cond. R. 4.4(A).

Plaintiffs allege that Rule 4.4(A) violates both the Committee's and O'Toole's rights to freedom of speech, freedom of association, due process, and equal protection. But the claim hinges on O'Toole's rights because the rule prevents her from "personally soliciting." Addition-

ally, Plaintiffs allege that the Rule violates the constitutional rights of "potential contributors," (*Id.* at ¶ 181), but no potential contributor is a party to this lawsuit besides Gary Broska, who did not need to be solicited, but at the time of the complaint "desire[d] to make a contribution." (Am. Compl. at ¶ 49). In any event, Plaintiffs do not allege that the rule violates any specific provision of the Constitution as-applied to Broska.

The parties agree that strict scrutiny applies to O'Toole's claim.

The Supreme Court applied strict scrutiny to the personal-solicitation prohibition in *Williams-Yulee*, holding that Florida's version was narrowly tailored to further its compelling interest. *Williams-Yulee* at 1668. Ohio's personal-solicitation ban has a few exceptions. If Florida's solicitation ban was narrowly tailored to meet an almost identical interest, Ohio's solicitation ban is even more narrowly tailored. *O'Toole v. O'Connor*, 802 F.3d at 790 (fundraising window "restricts an even narrower slice of speech" than the regulation in *Williams-Yulee*).

In an attempt to escape *Williams-Yulee*, Plaintiffs argue that several other states allow judicial candidates to personally solicit campaign contributions without "any diminution in the confidence in the judiciary." (Pls.' Resp. at 18). Plaintiffs argue that certain factual issues, namely the effect that allowing personal solicitation has had in certain states, require discovery. But the choices of other states have little to no bearing on whether Ohio's choice is constitutional. "These considered judgments deserve our respect, especially because they reflect sensitive choices by States in an area central to their own governance—how to select those who 'sit as their judges.'" *Williams-Yulee*, 135 S. Ct. at 1671 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). Alabama's choice does not require Ohio to follow suit.

The rule is narrowly tailored. Defendants argue, without contest from Plaintiffs, that the Rule is not underinclusive, a sentiment with which the Court agrees. But is the rule unconstitutionally vague?

Plaintiffs want the chance to develop facts, and in lieu of that, they want the Court to consider the facts from a similar case. First, Plaintiffs demand they be allowed to develop a full evidentiary record before the Court decides this issue. Second, Plaintiffs urge the Court to consider interrogatory responses in a separate, but similar, case involving a different plaintiff and in

front of a different judge. The interrogatories in that case posed four hypotheticals, asking whether each situation violated Rule 4.4(A). (Discovery Responses in *Platt*, 1:13-cv-435, Doc. 32-3). Plaintiffs argue that the *Platt* defendants' answers acknowledge that Rule 4.4(A) is vague.

The *Platt* defendants' actual answers belie Plaintiffs' argument. Defendants objected to each of the at-issue interrogatories as asking for a conclusion of law and speculation and further referred the plaintiffs to Rule 4.4(A) and related Advisory Opinions. (Doc. 32-3 at PageID 907–08). The closest thing to "acknowledging" that the Rule is vague is the canned response that "a violation of the Ohio Code of Judicial Conduct would be evaluated on a case-by-case basis." (*Id.*). The *Platt* interrogatory responses do not show that Rule 4.4(A) is vague.

The Court also has (1) the rules, and (2) two pleaded hypotheticals that Plaintiffs argue show the rule to be unconstitutionally vague because they present situations of questionable legality.

"A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). "[A] more stringent vagueness test should apply" to laws that interfere with the right to freedom of speech. *Id.* at 499. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). But the Constitution tolerates some degree of vagueness, *Vill. of Hoffman Estates*, 455 U.S. at 498, for "[c]ondemned to the use of words, we can never expect mathematical certainty from our language," *Grayned*, 408 U.S. at 110. How much vagueness the Constitution permits depends on whether the law threatens to inhibit the exercise of constitutionally protected rights, whether the law bears civil rather than criminal penalties, whether the rule is written with a scienter requirement; put broadly, "on the nature of the enactment." *Vill. of Hoffman Estates*, 455 U.S. at 498–99; *see Hill*, 530 U.S. at 732.

How stringent a test should the Court apply to the rule for vagueness? The rule restrains First Amendment freedoms, so "a more stringent vagueness test should apply." *Vill. of Hoffman*

*Estates*, 455 U.S. at 499. But the nature of this regulation loosens the test a bit because (1) the rule bears civil rather than criminal penalties, and (2) the rule includes an implicit scienter requirement. *See id.* at 498–99.

At issue here is the following portion of Rule 4.4(A): "A *judicial candidate* shall not personally solicit campaign *contributions*, except as expressly authorized in this division . . . ." Ohio Jud. Cond. R. 4.4(A). The Committee and O'Toole argue that the rule is vague because they are unsure if two situations violate the rule; thus the rule has caused them to "'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (internal citation omitted) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). Plaintiffs challenge fails for two reasons: (1) the plain language of the rule puts Plaintiffs on notice of prohibited behavior; (2) the enforcement process has procedures to protect against arbitrary enforcement.

The two words at issue are "personally" and "solicit." "Personally" means, "so as to be personal:  in a personal manner; *often*:  as oneself: on or for one's own part." *Webster's Third New International Dictionary, Unabridged* (2016). "Solicit" means, "to make petition to . . . especially: to approach with a request or plea (as in selling or begging)." *Id.* Especially in combination with the provision of a campaign committee that may directly solicit contributions, this prohibition is not difficult to understand: the judicial candidate cannot hold out her hand and ask people for money—her committee can. *See Williams-Yulee*, 135 S. Ct. at 1667. Ohio courts have interpreted Rule 4.4(A) consistently with this plain sense meaning. *See, e.g.*, *Disciplinary Counsel v. O'Neill*, 2004-Ohio-4704, 103 Ohio St. 3d 204, 815 N.E.2d 286, ¶ 42 (holding that judicial candidate's statement that two law firms "needed to step up to the plate and contribute to her campaign" was personal solicitation). But what about Plaintiffs' two hypotheticals?

To start, a rule is not unconstitutionally vague because a plaintiff presents a tough hypothetical. *See Grayned*, 408 U.S. at 112 n.15 ("It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" (quoting *Am. Commc'ns Assn. v. Douds*, 339 U.S. 382, 412 (1950))). "Close cases can be imagined under virtually any statute." *United States v. Williams*, 553 U.S. 285, 306

(2008). The Court could uphold the rule even under pressure from Plaintiffs' hypotheticals, but the Court sees answers to both.

First, Plaintiffs wonder about bundlers:

> The personal solicitation prohibition of Rule 4.4(A) of the Ohio Code of Judicial Conduct does not prohibit a judicial candidate from personally soliciting an individual to serve as a "bundler" of campaign contributions, *i.e.*, to be a person who solicits and/or gathers contributions from many different individuals or entities with the goal or purpose of raising or gathering at least a certain targeted level of accumulated contributions, and then presents the accumulated contributions (or "bundle") to a campaign committee in one lump sum.

(Am. Compl. at ¶ 175).

Rule 4.4(A) prohibits this conduct. A bundler aggregates many smaller contributions. The bundler then gives those smaller contributions in a "bundled" contribution. In Plaintiffs' hypothetical, the bundler acts at the personal request of the judicial candidate. Soliciting a bundler is to solicit a large contribution made up of many smaller ones. The judicial candidate is not personally soliciting each contribution, but they are personally soliciting a larger contribution from the bundler. Furthermore, the rule describes three discrete situations in which a candidate may personally solicit, and soliciting a bundler is not mentioned. Because the Court believes Rule 4.4(A) prohibits a judicial candidate from soliciting a contribution from a bundler, Rule 4.4(A) is not unconstitutionally vague as to Plaintiffs' first hypothetical.

Second, Plaintiffs wonder about counter-solicitation: "[T]he personal solicitation prohibition of Rule 4.4(A) of the Ohio Code of Judicial Conduct does not prohibit a judicial candidate from personally soliciting potential contributions not to contribute to the opponent of the judicial candidate or any other judicial candidate." (Am. Compl. at ¶ 176). It is unclear what "potential contributions not to contribute" means; Plaintiffs appear to argue that the rule may prohibit judicial candidates from asking people to not give money to their opponent. Rule 4.4(A) does not prohibit this conduct.

Rule 4.4(A) states that "[a] *judicial candidate* shall not personally solicit campaign *contributions*." *Id.* It does not prohibit a candidate from saying, "Please don't give any money to my opponent." Plaintiffs think the definition of contribution should include a promise to not give

money to the other side (a "contribution not to contribute"?). But "contributions" is a term of art in the Code; it "has the same meaning as in R.C. [Ohio Revised Code] 3517.01." Ohio Jud. Cond. R. 4.6(B). Ohio's definition of "contribution" includes many things you might expect: "a loan, gift, deposit, forgiveness of indebtedness, donation, advance, payment, or transfer of funds or anything of value." *See* Ohio Rev. Code 3517.01(C)(5). It does not include a promise not to contribute. *See id.* The plain language of the rule shows the rule is not unconstitutionally vague, partially because the Code defines many of its key terms, which limits the possibility of arbitrary enforcement.

The second reason Plaintiffs' vagueness challenge fails is Ohio has a fair enforcement process. Since Plaintiffs' vagueness challenge has its roots in the Due Process Clause, it makes sense to permit Ohio (and candidates for judicial election in Ohio) to use the administrative system already in place to "flesh out details" of the rules by way of advisory opinion. *Bauer v. Shepard*, 620 F.3d 704, 716 (7th Cir. 2010). Admittedly, the rule could be arbitrarily enforced. But to do so, many decisionmakers would have to do so independently and in different stages of review. Because this rule does not authorize or encourage arbitrary or discriminatory enforcement, it is not unconstitutionally vague.

To conclude, even if Plaintiffs could contrive some law-school-final-exam hypotheticals that would make a first-year law student tremble in their boots, that might not be enough to state a vagueness challenge. Here, the Court can answer Plaintiffs' hypotheticals, and since the law is not vague in the two situations Plaintiffs plead, it is not void for vagueness. The Court dismisses Plaintiffs' claims regarding the personal-solicitation prohibition.

### D. Rule 4.4(A) – Candidate Personally Responsible for Committee's Conduct

O'Toole and the Committee bring facial and as-applied challenges to the personal-responsibility provision of Rule 4.4(A). The rule states:

> A *judicial candidate* may establish a campaign committee to manage and conduct a campaign for the candidate, subject to the provisions of this Code. The *judicial candidate* is responsible for ensuring that his or her campaign committee complies with applicable provisions of this Code and other applicable *law*.

Ohio Jud. Cond. R. 4.4(A).

Plaintiffs claim it is unconstitutional to impose liability on a judicial candidate for her campaign committee's speech. But judicial campaign committees do not germinate at random, nor is the candidate permitted to establish the committee and take her hands off the wheel. The rules create an environment where there are no rogue committees. The judicial campaign committee is designed to promote both distance and responsibility between it and the judicial candidate: distance in the "ask" for money and the candidate; responsibility so that the committee is not a vehicle to insulate the candidate from her committee's wrongdoing.

Defendants make three arguments in support of their motion: (1) if the other rules are valid, so is this one; (2) Plaintiffs do not have standing because the rules do not chill speech; and (3) since the rule only regulates expressive conduct and not speech, the constitutional analysis is even more favorable to Defendants. Plaintiffs respond that the Committee has tempered its speech because it does not want to have its chosen candidate face disciplinary action. But does the Committee have standing? This matters because the Court finds that the rule as it applies to O'Toole does not even regulate speech, so the only way Plaintiffs get the benefit of strict scrutiny analysis is if the Committee has standing for its chilled-speech claim.

### 1. The Committee's Standing

Defendants argue that the Committee lacks the requisite injury-in-fact to show it has standing to sue because the rule regulates the candidate and not the Committee. Plaintiffs argue that the rule chills the Committee's speech by holding its candidate responsible for its speech. The Committee is wrong because the provision does not chill any speech not already chilled by other rules.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). It is difficult to prove an injury-in-fact when the government has yet to enforce an allegedly First-Amendment-limiting law. But "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 2342 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Here, the Committee wants to engage in speech prohibited by the rules; specifically, the Committee wants to take acts prohibited by Rule 4.4(E). (Am. Compl. at ¶¶ 189–91). And that is why it has standing to challenge that rule. The Committee alleges it would violate that rule if not for the personal-responsibility provision that would put its candidate on the hook for its violations. (Am. Compl. at ¶ 191). But that does not give the Committee standing to challenge the personal-responsibility provision. The unique relationship between the Committee and the judicial candidate provides the reason why.

The Committee is established at the option of the judicial candidate. Ohio Jud. Cond. R. 4.4(A). Properly understood, the personal-responsibility provision is the reason O'Toole has standing to challenge the substantive regulations governing her campaign committee (e.g. the fundraising window), and the reason that the substantive regulations directed at the campaign committee have any teeth at all. The enforcement process for illegal campaign conduct contemplates violations by a judicial candidate, not a judicial candidate's campaign committee. *See* Ohio Supreme Court Rules for the Government of the Judiciary, Rule II, § 5 (2015). The Committee has standing to challenge the other substantive rules it claims it would violate. However, it suffers no additional injury if O'Toole is made responsible for ensuring its compliance with those rules. But, Plaintiffs argue, rules that do not facially regulate speech may still restrict speech; Plaintiffs are right. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (recognizing that a regulation can implicate the First Amendment even if it "says nothing about speech on its face"). But here, the rule does not restrict any more of the Committee's speech than was already restricted by the other rules. Therefore, the Committee lacks standing to challenge the personal-responsibility provision.

### 2.  Merits

O'Toole does have standing; that much is unchallenged. But O'Toole only alleges that the personal-responsibility provision is invalid because it "imposes vicarious liability upon such judicial candidate for the speech of third parties." (Am. Compl. at ¶ 188). This, operating by itself is not even a restriction on O'Toole's free speech.

Plaintiffs offer little argument on what test should be applied to this provision as it regulates O'Toole. Defendants argue that the personal-responsibility provision regulates symbolic or expressive conduct, a category of activity the First Amendment protects, albeit with less muscle than regular speech. (Defs.' Mot. at 51). But the First Amendment protects speech, and only protects conduct when that conduct communicates an idea much like the spoken or written word. *See Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974). Expressive conduct includes displaying the American flag altered to include a peace symbol, *id.* at 406, nude dancing, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991), and marching while displaying a swastika. *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43–44 (1977). The personal-responsibility provision, as it regulates O'Toole, regulates only "non-expressive conduct, not speech, and as a result lie[s] beyond the protection of the First Amendment." *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 510 (6th Cir. 2008) (finding statute that prohibited telecommunications providers from collecting a tax directly from the purchaser to not implicate First Amendment). And because Plaintiffs only baldly state legal conclusions about the personal-responsibility provision violating their rights to the due process of law, to association, and to equal protection, the Court need not and does not accept them as true. What analysis should the Court apply?

The personal-responsibility provision cannot be properly understood without its context. Rule 4.4(A) bans personal solicitation, allows candidates to create a committee to solicit and receive contributions, and then regulates that committee, ultimately permitting some speech that would otherwise have been prohibited by the broad (and constitutional) personal-solicitation ban. *See id.*; Ohio Jud. Cond. Rule 4.4, cmt. [2] ("A judicial candidate may establish a judicial campaign committee to solicit and accept campaign contributions, manage the expenditure of campaign funds, and generally conduct the campaign. In so doing, the campaign committee shall follow the provisions of the rule regarding the solicitation and receipt of contributions. A campaign committee shall follow all time guidelines controlling when judicial fundraising shall begin and end in reference to a particular judicial election."). Rule 4.4(A)'s personal-solicitation prohibition is constitutional; the Court now assesses the balance of the rule. To the extent that the balance of Rule 4.4(A) regulates speech at all, it permits more speech, not less. It is therefore outside of the protections of the First Amendment.

Because this rule "neither implicates a fundamental right nor creates a suspect classification, rational basis review applies." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 693 (6th Cir. 2014). "Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose." *Id.* at 694. The Code creates a regime where there are no rogue committees, and that system is rationally related to the purpose of an independent, fair, and impartial judiciary with candidates who can still raise money for their campaign. Plaintiffs have failed to state a claim about the personal-responsibility provision.

### E.  Other challenges

Defendants move to dismiss Plaintiffs' remaining freedom-of-association and Fourteenth Amendment claims. (*See* Defs.' Mot. at 52–54). Plaintiffs argue that Defendants unfairly focus on a few conclusory allegations while ignoring the extensively pleaded factual predicates for those statements. And to the extent Plaintiffs pleaded any factual predicates, the Court has already addressed those substantive claims. To the extent Plaintiffs baldly assert any other Fourteenth Amendment or freedom-of-association claims, those claims are not adequately pleaded. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting that bare legal conclusions are inadequate to survive a motion to dismiss).

## IV. Conclusion

The Court **GRANTS** Defendants' motion for judgment on the pleadings, (Doc. 27), except as to Plaintiffs' claim regarding Rule 4.3(C).

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE:  August 18, 2016